IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Detention of | No. 86665-6-I |
| M.P., | UNPUBLISHED OPINION |
| Appellant. | |

BOWMAN, A.C.J. — M.P. challenges the trial court's order committing him to 14 days of involuntary detention and treatment for his mental health disorder. He claims that the record lacks sufficient evidence that he posed a likelihood of serious harm to others and was gravely disabled. We disagree, and affirm.

FACTS

M.P. is a 60-year-old man from Wisconsin. He also co-owns a business in Colorado with Paul Myers. M.P. has a history of major depressive disorder and possible bipolar disorder and is under the care of a psychiatrist in his home state.

On April 28, 2024, Seattle police officers transported M.P. to the emergency department at Swedish First Hill after he was trespassed from a hotel. During his evaluation in the emergency department, M.P. exhibited "mania, intermittent agitation, aggression, grandiosity, poor impulse control and delusional thought processes." Swedish detained M.P. for 120 hours of psychiatric evaluation and then transferred him to Fairfax Hospital for inpatient behavioral health services.

On May 3, 2024, Fairfax petitioned for 14 days of involuntary treatment, asserting that M.P. suffered from a mental disorder that presented a likelihood of serious harm to others and that he was gravely disabled. According to the petition, M.P. "continued to evidence symptoms of behavioral health disorder by irritability, labile mood, grandiosity, hyperverbal, agitation, posturing at peers, and limited insight into behavior leading to hospitalization," and he was "showing an increased loss of cognitive and volitional functioning, poor insight regarding symptoms and it would be essential for further hospitalization."

The trial court held a two-day commitment hearing on May 3 and 6, 2024. In support of the petition, it heard testimony from M.P.'s sister Katherine Eaton, his nephew Michael Eaton, his coworker Charles Styles, and licensed mental health counselor Bryan Hayden. M.P. testified in opposition to his detention for treatment.

Katherine[1] described her brother as "[k]ind, considerate, fun, upbeat," and a "real people person" at his "baseline" functioning. But beginning in January 2024, Katherine observed that he was quick to anger, judgmental, and very critical. On April 22, 2024, she travelled from Wisconsin to Seattle because she learned that SeaTac police arrested M.P. According to Katherine, M.P. told her that officers arrested him for trespassing at the airport, but that "he believed it to be bogus." After jail, SeaTac police took M.P. to a crisis center. When the crisis center released him, M.P. could not determine which bus to ride to his nephew

---

[1] For clarity, we refer to Katherine Eaton and her son, Michael Eaton, by their first names and intend no disrespect by doing so.

Michael's house in Seattle, and he "walked all night." M.P. told Katherine that someone mugged him and took his phone and wallet.

Katherine and Michael drove M.P. to Costco so he could replace his phone and buy clothing and food. While buying the new phone, M.P. became angry with Katherine, "got within an inch of [her] face," and started "screaming" at her. Katherine testified, "I guess I wouldn't say right at that second that I thought he was going to be violent, but in hindsight, I'm very — I'm afraid. And my son at that point did call 9-1-1." Katherine elaborated, "I didn't know what was going to happen next and I didn't know how to make sure he didn't get himself in more trouble." When asked if she was afraid for her own safety, Katherine responded, "I've never thought of him as violent ever. So, it's hard to — but I was afraid that might have been the next step."

Michael also provided his version of the events at Costco with his mom and M.P. According to Michael, M.P. "exploded" at Katherine. "He got right in her face. He started screaming at the top of his lungs. He berated her in a way I have never seen anyone do since like childhood. You know, he was immensely [verbally] abusive." Michael was "extremely worried" that M.P. might be capable of physical violence. Michael testified, "I did not want to have him anywhere in or around my house and I didn't want him around my mother after that," and, "I was terrified of the man. You know, I — I was completely scared of my uncle."

Michael testified that he met M.P. for dinner at a Seattle restaurant around the same time. Michael asked M.P. why he had a black eye and a brace on his wrist, and M.P. said that he had been in a fight. Michael had never known his uncle to fight, so the behavior was out of character for M.P. and "really alarming."

3

During dinner, M.P. engaged Michael in a "loud" and "graphic" sexual conversation, "which seemed a little strange."

M.P. then turned the conversation to his business partner, Myers, and told Michael, " 'I'm gonna kill Paul.' " Michael testified, "I have never seen the man so angry. I have never seen him get that — there was just this look on his face that was terrifying." When asked if M.P. would be welcome at his house "in his current state," Michael replied, "No, no. I would not let that man in my house right now."

Styles is an employee of M.P.'s company in Colorado. He described an incident that happened in March 2024 when M.P. visited the Colorado office. Styles testified that M.P met with a coworker named "Lizzie" and that "[t]hings got very heated in the office. [M.P.] was behaving very erratically, raising his voice, shouting, [and] yelling." M.P. then grabbed Lizzie's shoulder, turned her around, and started screaming at her. Styles physically inserted himself between M.P. and Lizzie to "diffuse the situation." M.P. then screamed at Styles, who threatened to call the police if M.P. "did not get away from [him]."

Later that evening, Styles left the office and was walking down the road when M.P. drove by him going the opposite direction. According to Styles, when M.P. passed him,

> I heard him hit his brakes, and I looked back, he was doing a U-turn, so I kept walking. He came flying back up the road. I heard the car approaching very quickly from behind . . . .
> . . . .
> . . . When he drove up, I could hear the car was right behind me, I turned around and jumped to my right. [M.P.] had swerved and then was beginning another U-turn. On that U-turn, after I had jumped to my right, he crashed into the snowbank on the median. Was obviously out of control. He then reversed, came up right

4

alongside me. I was continuing to walk at this point, he screamed something out of the car. I could not tell what he said. And then peeled off and I kept walking.

Styles elaborated, "I felt like I was in danger, so I got out of the way. He was approaching quickly. I didn't want to turn around and look at him, so I jumped to the right. His car was very close to me." Styles was "terrified" and "felt like [he] was being intimidated with a vehicle."

Styles testified that soon after, the Colorado office obtained a permanent restraining order against M.P. because the staff were "confused" and "afraid" of him.[2] And while the temporary restraining order was in place, M.P. violated the order by texting Styles the week before the hearing on the permanent restraining order to tell Styles that he "needed legal representation." Styles interpreted the text as a threat. Styles testified, "I genuinely feel scared when I hear from [M.P.]. He's unpredictable." At the time of the May hearing, Styles stated that he would not feel comfortable around M.P.

Fairfax licensed mental health counselor Hayden observed and evaluated M.P. and reviewed his medical record. Hayden testified that M.P. had a mental impairment with a working diagnosis of "unspecified schizophrenia spectrum disorder." Hayden opined that due to his mental disorder, M.P. presented a "substantial risk of physical harm to others" and was "gravely disabled." Hayden explained that M.P. "is showing very poor impulse control. He is easily agitated, irritable, he is verbally aggressive, he is posturing at staff, [and] he is causing

---

[2] The company obtained a temporary restraining order against M.P. on April 5, 2024, and a permanent order on April 15. The company petitioned for a civil protection order on April 16.

disruption on the units," while "at [other] times being calm and cooperative." Further, M.P.

> continues to feel that he is being persecuted and pressured and that these are things that are being done to him versus things that are results of his own actions. So he is having difficulty putting together and processing both his behaviors as well [as] reactions that others are exhibiting to his behaviors.

Hayden testified that Fairfax had administered the "Bröset Violence Admission Assessment" (BVAA) to M.P. in the first 24 hours at the hospital. The test has a scale of zero to six, with a score of three or higher indicating that a "risk of violence is high" and that "preventative measures should be taken." M.P. repeatedly received a score of three due to confusion, irritability, and boisterousness. Throughout his stay in the hospital, M.P. was hyperverbal, demanding, defiant, agitated, argumentative, and assaultive toward staff.

The behavior Hayden testified to was also evident during the commitment hearing. Hayden appeared at the hearing virtually with M.P. nearby, so M.P. could hear his testimony. Hayden described for the court M.P.'s behavior throughout his testimony:

> He is verbally threatening me by calling me a prick. He is slamming his pen forcibly down on the table. He is argumentative in the courtroom and is showing a complete lack of control or understanding of the situation that he is in. So the concern is that he does still remain at risk. To refer again to the [BVAA], we are seeing here in the courtroom currently irritability, boisterousness and attacking objects that he's banging on the table. So we are still seeing him being at high risk of physical aggression.

Hayden also explained that M.P. lacked any insight into his need for treatment, stating, "He does not see that he needs to be stabilized." When asked

6

for any other details informing his opinion on M.P.'s need for treatment, Hayden said:

> [O]ur concern is that what we are seeing here is not the [M.P.] that is described by his sister or his nephew or even his employee; that this what we're seeing is someone who is — I don't think I've ever used this in Court, but someone who is completely unhinged.

According to Hayden, "[w]hat we are seeing is someone who is not able to meet their own needs."

M.P. testified that he came to Seattle in April 2024 for business and to visit a friend. When asked where he would reside if discharged from the hospital, M.P. said he "would quarantine" at a hotel to protect his elderly mother's health, but he would then fly to Tokyo for business instead of home to Wisconsin. M.P. admitted to having "anger issues" but asserted that he would "never physically hurt or touch" someone.

When asked if he wanted to remain inpatient at the hospital, M.P. responded, "Absolutely not. . . . I'm not one of these crazy people." He also explained, "I've got work to do and I've got things to get done." In answer to a question about the company's restraining order against him, M.P. stated, "That was instigated by Paul Myers, who is a thief and his nephew, Charlie Styles, who will be going to jail as soon as I finish the work I do here." He claimed to be unaware of the restraining order and admitted to recently calling Myers to "make sure payroll is getting taken care of" and to "get our taxes done."

At the end of the hearing, the court granted the State's petition and entered an order committing M.P. for 14 days of involuntary treatment. According to the trial court, M.P. has a behavioral health disorder "with a working

diagnosis of unspecified schizophrenia, which has had a substantial adverse effect upon [his] cognitive and volitional functioning." The court found by a preponderance of the evidence that M.P. presents a substantial risk of physical harm to others as shown by the incidents described by Katherine, Michael, and Styles. Noting M.P.'s lack of impulse control, the court explained, "The concern, because of his erratic behavior and poor impulse control, is that he will actually act on this and harm somebody. He will pick fights with others. He's putting himself and others in danger."

The court also determined that M.P. "was not able to provide for his essential needs of health and safety pursuant to prong B of grave disability."[3] And that the State proved "there has been a severe deterioration in routine functioning," as shown by "behavior that has been described as evidenced by the repeated and escalating loss of cognitive and volitional function. He has lost his phone, his wallet. He has never been like that either."

The trial court cited "credible testimony" that

at his baseline, [M.P.] is kind, considerate, and helpful. However, [Katherine] testified that he had strayed from his baseline and had been acting aggressively and impulsively. He attempted to navigate Seattle without a wallet, without secure housing, and after having gotten into legal trouble at SeaTac airport.

The court also noted M.P. cannot care for his essential human needs, relying on his sister and nephew. Moreover, his "insight into his need for treatment is extremely poor. He does not see that he needs to be stabilized. He is continuing to engage in or demonstrate many symptoms."

---

[3] *See* RCW 71.05.020(25)(b).

Finally, the court found that less restrictive alternatives to involuntary detention and treatment were not in M.P.'s best interests.

> [H]e is still highly impulsive, symptomatic, and lacking in proper insights into his need for treatment. Given the sustained risk he poses to others and his inability to provide for his essential needs in his decompensated state, [M.P.] needs the secure environment of an inpatient setting.

M.P. appeals.

## ANALYSIS

M.P. contends that the trial court erred by entering the 14-day involuntary commitment order without sufficient evidence that he both presented a likelihood of serious harm and was gravely disabled.

Where, as here, the trial court has weighed the evidence, we limit our review of its voluntary commitment order to determining whether substantial evidence supports the court's findings of fact, and whether those findings support its conclusions of law and judgment. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.' " *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978)).

The challenging party bears the burden of proving that substantial evidence does not support a finding of fact. *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). To commit a person for 14 days of involuntary treatment, the State must show

> by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely

> disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others.

RCW 71.05.240(4)(a).  We view challenges to the sufficiency of the evidence in a light most favorable to the State.  *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

I.  <u>Likelihood of Serious Harm</u>

M.P. contends that the record lacks substantial evidence of a recent overt act that seriously harmed others or placed others in reasonable fear of harm. According to M.P., his pattern of verbal aggression does not show a likelihood of physical harm, and the only overt act causing apprehension of physical harm— intimidating Styles with his car—occurred two months before the hearing.  We disagree.

To involuntarily detain a person for treatment, "likelihood of serious harm" means " 'a substantial risk' of physical harm to self, others, or property of others." *T.C.*, 11 Wn. App. 2d at 57 (quoting RCW 71.05.020(37)(a)).  A substantial risk of physical harm requires a "recent overt act" that "caused harm or create[d] a reasonable apprehension of dangerousness."  *In re Det. of Harris*, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982).  But imminent danger is unnecessary, as "the practical effect of being placed in the hospital will usually eliminate the 'imminence' of one's dangerousness."  *Id.* at 283-84.

Here, the trial court cited the March 2024 incident of almost hitting Styles with his car as evidence that M.P. presents a substantial risk of physical harm to others.  The court found that M.P. "came very close to striking Mr. Styles with his car, who testified that he had to jump out of the way to avoid an impact."

M.P. contends that this incident does not support the conclusion that he posed a substantial risk to others. But Styles testified that M.P.'s car was "very close to [him]," so close that Styles jumped to get out of the way. And M.P. then crashed his vehicle into a snowbank, so he was clearly out of control. Styles felt like he was in danger and being threatened with the vehicle. This testimony constitutes substantial evidence to support the trial court's finding that M.P. came close to striking Styles with his car.[4]

M.P. also claims that the March incident was too remote to constitute a recent overt act because M.P. "had spent [two] months in the community following these acts, without another incident involving Mr. Styles." But no matter who was involved, the record reflects that M.P.'s behavior and actions raised concerns about the potential for violence after the incident in Colorado, and even during his initial detention.

Katherine testified that she had never considered M.P. to be violent, but after the Costco incident, she "was afraid that might have been a next step." Michael explicitly stated that he was "terrified" by the Costco incident and "extremely worried" that M.P. was capable of physical violence. Michael also testified that during their dinner together, he saw M.P. had injuries, and M.P. told him that they were from a fight. In the hospital, M.P.'s BVAA score indicated a high risk of violence, requiring preventative measures. Notes from his hospital stay describe his aggressive, threatening, and "assaultive" behavior toward staff.

---

[4] We also note the evidence showed that just a few hours earlier, M.P. grabbed his coworker Lizzie by her shoulder and screamed at her.

11

And Hayden expressed concern that M.P. would act on his threats and impulses if discharged from the hospital.

Based on the evidence in the record, M.P.'s behavior created a reasonable apprehension of dangerousness for several people. Substantial evidence supports the trial court's findings and conclusion that M.P. presented a likelihood of serious harm to others.

## II. Gravely Disabled

M.P. claims the record lacks substantial evidence that he was gravely disabled because "he, along with his family, was meeting his essential human needs of health and safety." We disagree.

The legislature defines "gravely disabled" as "a condition in which a person, as a result of a behavioral health disorder,"

> (a) [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or
> (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). The subsections of RCW 71.05.020(25) provide alternative definitions of "gravely disabled," either of which provide a basis for involuntary commitment. *LaBelle*, 107 Wn.2d at 202.[5]

Here, the trial court found M.P. gravely disabled under only RCW 71.05.020(25)(b). Evidence that a petitioner is "gravely disabled" under subsection (b) requires "recent proof" of severe deterioration in routine

---

[5] *LaBelle* cites the definition of "gravely disabled" under former RCW 71.05.020(1)(b) (1979). That definition has not changed.

functioning and "significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208. And the evidence "must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health and safety." *Id.* The State must also show that the individual "is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.*

Here, the State presented evidence of M.P.'s deteriorating behavior over the four months leading to his involuntary detention. At his baseline, the testimony showed that M.P. successfully co-owned a business, and his employees considered him a "pretty laid back, casual guy." His family described him as kind and considerate.

But starting in January 2024, his coworkers and family noticed behavioral changes in M.P. He was uncharacteristically angry, critical, and judgmental. During his March visit to the Colorado office, he grabbed Lizzie and screamed at her, chased Styles with his vehicle, and frightened his coworkers such that they sought a restraining order. In April, M.P.'s behavior led to a fight and resulting injuries, being trespassed from both the airport and a hotel, a visit to jail, an all-night walk during which someone mugged him and took his wallet and phone, and an involuntary police transport to the emergency department.

And, even after hospitalization, M.P. demonstrated irritability, erratic behavior, and poor impulse control. Hayden described him as "completely unhinged." This evidence establishes that M.P. had experienced a severe and escalating deterioration of his routine functioning and a loss of cognitive and volitional control.

13

Further, the evidence showed M.P. would not receive necessary care if discharged. M.P. admitted that he had stopped taking his psychotropic medication before his visit to Seattle. He acknowledged only his "anger issues" and denied any need for treatment. And he vigorously objected to his hospitalization. As Hayden testified, M.P. "is unable to engage or plan appropriately for any kind of discharge plan or to seek the treatment that is necessary." Substantial evidence supports the trial court's conclusion that M.P. is gravely disabled under RCW 71.05.020(25)(b).

Because the State proved by a preponderance of the evidence that M.P. was both a substantial risk to others and gravely disabled, the trial court did not err in entering the order committing him to 14 days of involuntary detention and treatment, and we affirm.

_____, ACJ

WE CONCUR:

_____        _____
Feldman, J.                        Coburn, J.

14